(C.D. 2634)

CARMICHAEL FORWARDING SERVICE, A/C DALLON'S LABORATORIES, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided March 21, 1966)

*Stein & Shostak* (*S. Richard Shostak* of counsel) for the plaintiff.
*John W. Douglas,* Assistant Attorney General (*Richard J. Kaplan* and *Alfred A. Taylor, Jr.,* trial attorneys), for the defendant.

Before RAO, FORD, and DONLON, Judges

DONLON, Judge: The issue here is the frequently liquidated controversy as to what is, for tariff purposes, a surgical instrument. The articles at bar are described as electronic amplifiers, or micromanometers, and transducers with catheter tip. They are used to monitor heart pressure and heart sounds through catheterization, that is, insertion of a catheter.

They were classified by the collector as surgical instruments under paragraph 359 of the Tariff Act of 1930, as modified by the Annecy Protocol of Terms of Accession to the General Agreement on Tariffs and Trade (T.D. 52373), dutiable at 45 per centum ad valorem. The protest claim is that these are not surgical instruments; that they are electrical therapeutic instruments, other than laboratory instruments, not specially provided for, enumerated in paragraph 353, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade (T.D. 54108) ; and that the correct duty rate is 15 per centum ad valorem.

The tariff provisions of the collector's classification and of the protest claim, respectively, are as follows:

Paragraph 359, as modified by T.D. 52373.

Surgical instruments, and parts thereof, * * * composed wholly or in part of iron, steel, copper, brass, nickel, aluminum, or other metal, finished or unfinished (except hypodermic and other surgical needles, and except instruments and parts in chief value of glass).

Paragraph 353, as modified by T.D. 54108.

Electrical therapeutic (including diagnostic) apparatus, instruments (other than laboratory), and devices, finished or unfinished, wholly or in chief value of metal, and not specially provided for.

Both of these are use provisions. The collector is presumed to have found each and every fact basic to his classification. Plaintiff has the burden of proving by competent evidence not only that the chief use of these electronic amplifiers and transducers is *not* as surgical instruments, but also that the chief use throughout the United States is the use described in paragraph 353 and that, if these be instruments (as the collector found) and electrical (a fact that is conceded), they are electrical therapeutic instruments "other than laboratory."

In our opinion plaintiff has not sustained this burden of proof.

The common meanings of the words of use classification that Congress employed have relevance to this problem. In Webster's New International Dictionary, 2d edition, 1958, we find these definitions:

surgical: 1. Of or pertaining to surgeons or surgery.

surgery: 1. That branch of medical science, art, and practice, which is concerned with the correction of deformities and defects, the repair of injuries, the *diagnosis* and cure of diseases, the relief of suffering, and the prolongation of life, *by manual and instrumental operations.* [Emphasis supplied.]

therapeutic: *Med.* Of or pertaining to the healing art; concerned with remedies for diseases; curative.

diagnostic: *Med.* Indicating the nature of a disease.

There are in evidence two exhibits illustrating the articles at bar, with descriptive material. Exhibit 1 was introduced by plaintiff. It was described by plaintiff's counsel as "a one-sheet flier put out by Dallons, with reference to the MM–41R Micromanometer and MSD8 Transducer." (As the title of this suit shows, Dallon's Laboratories, Inc., was the importer of the merchandise, for whose account plaintiff Carmichael Forwarding Service filed this protest.) Plaintiff's witness, Mr. Jordan D. Frasier, division manager and chief engineer of Dallon's Laboratories, a division of International Rectifier Corp., testified concerning the depicted and described articles. Exhibit A was introduced by defendant. It was identified by Mr. Frasier as a description, issued by Dallon's as a sales brochure, of the MM–41R micromanometer and its accessories, namely, (1) the micromanometer, (2) the transducer with catheter tip, and (3) an interconnecting cable. Mr. Frasier identified the picture of each of the three parts as depicted in exhibit A.

The articles at bar, in combination, "form a pressure measuring piece of equipment" (R. 7), utilized through the process known as catheterization. That is to say, the catheter at the tip of the transducer is introduced inside the heart, and cardiac pressures and cardiac sounds are monitored, or observed, by measurements recorded on the micromanometer.

Mr. Frasier is neither a surgeon nor a physician. He was qualified as an expert in the invention and manufacture of other heart monitoring instruments, in their sale, and in the sale of these imported instruments. He was, therefore, permitted by the presiding judge to testify as to his personal observation of surgical, therapeutic, and diagnostic uses.

He has seen the equipment used, but he has never seen it used *during* surgery. He did not say how often or when he observed use. Recalled to the stand by plaintiff's counsel after conclusion of his direct testimony and cross-examination, Mr. Frasier testified that he had seen the MM–41R micromanometer and the MSD8 transducer used in catheterizations at Creighton University and St. Joseph's Hospital, both in Omaha; at the University of Southern California and at the University of California Los Angeles; and "in Chicago."

He said that on "many, many occasions" he has observed "open heart surgery, catheterization, valve replacement, defibrillation." He did not say where, or when, or how often. He described the process of catheterization which, in his opinion as a layman, is a diagnostic process.

He expressed as his opinion that the equipment at bar is normally not used in heart surgery. He described other equipment of his firm,

known as the M–41R, or electromanometer, and said that it "can be used in surgery. Its prime function is for catheterization."

Of "possibly" 60 units of the instruments at bar that his firm has sold in the United States, Mr. Frasier said that one was sold to NASA and the others, approximately 59, are used in medical research laboratories and "in hospitals that perform heart work which would have to diagnose heart conditions."

How well has plaintiff met its double burden of proof?

We have no such witness here as the physicians and surgeons who testified as to surgical use in several of the cases cited by the parties in their briefs. Plaintiff's sole witness, Mr. Frasier, testified that he had observed the use of the articles at bar in four named institutions, two in Omaha and two in Los Angeles, and "in Chicago." Three of the identified institutions are universities. One is a hospital. This does not satisfactorily establish what the chief use of 60 such instruments was throughout the United States. Moreover, Mr. Frasier did not say how, or by whom, he saw these instruments used in the universities and hospital that he mentioned.

Reading this testimony in conjunction with Mr. Frasier's earlier testimony, on cross-examination, that NASA uses one (and will use four more) of the instruments for "non-medical" use, and that the "other 59" are used in medical research laboratories and in hospitals that do heart catheterization, we find it difficult to conclude that plaintiff has sufficiently shown, by its proofs, what the chief use of these instruments is. Moreover, if *arguendo* chief use is diagnostic, it appears that such use may be in laboratories, thus bringing the instruments within the exclusion specified in paragraph 353.

The collector found these to be surgical *instruments*. Even if surgical use is not the chief use, and the proofs as to that are not conclusive, we have no evidence that these are not instruments and, as such, excluded from paragraph 353 by reason of laboratory use.

As to surgical use, Mr. Frasier's testimony is that these instruments "are used in hospitals that do *heart catheterization*, which is really their prime use." (P. 50, emphasis added.) He described the procedure called catheterization, in response to questioning on cross-examination, as follows:

Q. Catheterization would consist of basically the maneuver that you described before where an incision would be made in the patient's body as to place the MSD8 into the vein or artery, and manipulate it to the heart, and take the readings once it has entered the heart; is that what catheterization is?—A. Yes, in this particular case. [R. 50.]

Catheterization is the medical procedure of introducing a catheter into parts of the body. Catheter is defined in Funk & Wagnalls Standard Dictionary, 1963 edition, as (medically) a "slender, tubular, *surgical instrument* for introduction into canals or passages." [Emphasis added.] Mr. Frasier testified that catheterization is performed by bodily incision and manipulation. The lexicographic definition of surgery, cited, *supra*, includes that branch of medical art that diagnoses disease *by manual and instrumental operations*.

Plaintiff's brief assumes that catheterization is not a surgical procedure. We find in the record no competent opinion testimony as to whether catheterization is or is not a surgical procedure, sufficient to overcome the presumptive correctness of the collector's finding, a finding reenforced by available lexicographic sources.

We have reviewed the cases that are cited by the parties in their briefs. That we do not discuss them is because we find that plaintiff's proofs are insufficient to call for decision on the merits. In our opinion, plaintiff has not met its burden of proof.

Without affirming the collector's classification, the protest is overruled.

Judgment will be entered accordingly.